### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ELDON N. WATSON, III | ) | No. 05-0212 |
| | ) | |
| | ) | |
| Plaintiff, | ) | Judge Joy Flowers Conti |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Francis X. Caiazza |
| | ) | |
| DR. LAWRENCE CONNELLY, | ) | |
| Individually, and as | ) | |
| Superintendent of | ) | |
| Mercer Area School District; | ) | |
| Dr. MICHELLE RHULE, | ) | |
| Individually, | ) | |
| and as Principal of the Mercer | ) | |
| Area Elementary School; and | ) | |
| MERCER AREA SCHOOL DISTRICT, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

### I. Recommendation

Eldon N. Watson, III ("Watson"), a former substitute teacher, alleges that he suffered age discrimination[1] in violation of the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. § 621 et seq., and the Pennsylvania Human Relations Act, ("PHRA") 43 Pa. Cons. Stat. § 951 et seq., when he was not hired as a full-time elementary school teacher in the Mercer Area

---

[1] Watson's complaint also alleged gender discrimination. The parties' Motions for Summary Judgment do not reference this claim, nor do they cite authority or evidence applicable to gender discrimination. Accordingly, the court does not address this issue.

School District("the District").[2] He also contends that the elementary school principal, Dr. Michelle Rhule ("Rhule") removed him from the list of eligible substitute teachers in unlawful retaliation for his complaints of age discrimination. The Defendants' Motion for Summary Judgment and Watson's Motion for Partial Summary Judgment are pending. Both parties' motions should be denied.

## II. __Background__

Watson's association with Mercer Area Elementary School spanned the academic years beginning in the fall of 1998 and ending in the spring of 2003. During those three years, he worked as a substitute teacher at the school a total of 330 days. In the spring of 2002, when Watson was forty-seven, the school announced that it would have openings for five full-time teachers beginning the following fall. From a pool of more than 300 applicants, Rhule selected thirty-seven candidates, including Watson, to be interviewed. In April 2002, Rhule, Cindy Portman ("Portman"), the assistant principal, and Albert French ("French"), a member of the school board, met to interview candidates for the open positions.

---

[2] The Court of Appeals for the Third Circuit has written "'that the PHRA is to be interpreted as identical to federal antidiscrimination laws unless there is something specifically different in its language requiring that it be treated differently.'" Slagle v. County of Clarion, 435 F.3d 265 n.5 (3d Cir. 2006)(quoting Fasold v. Justice, 409 F. 3d 178, 184 n.8 (3d. Cir. 2005)). Accordingly, the court's discussion applies with equal force to Watson's state and federal claims.

The District states that each interviewer evaluated the candidates using thirteen criteria, assigning each individual an overall ranking on a scale from one to five. After the top ranking candidate removed his name from consideration, the next highest ranking applicants, all females under the age of thirty, were referred to the District Superintendent, Dr. Lawrence Connelly ("Connelly") for evaluation. (Doc. 51 at 6) Each of these candidates was recommended to the Board, and each received and accepted a job offer.[3]

On May 9, 2002, Watson learned that he had not been hired. He alleges that he received a phone call from French telling him that he ranked near the top of those interviewed, and "just missed being hired." Watson, believing that he had been a victim of age discrimination, complained about the discrimination to Dr. Connelly at a July 15, 2002 meeting of the school board.

On July 18, 2003, Rhule wrote a letter to Connelly notifying him that she did not plan to call Watson to substitute again because of his complaints about District hiring policies and his threat to sue. Id. at 34. Connelly promptly opposed this course of action on legal grounds, informing Rhule that she should continue to call Watson. (Doc. 37-4 at 6-7). Rhule contends that she followed Connelly's instructions, but when she contacted

_____

[3] Watson contends that the District did not follow a consistent hiring procedure. The court has reviewed the evidence pertaining to this issue, and concludes that there was no material inconsistency.

Watson she was told by his wife, and was told again later by Watson himself, that he no longer wanted to be contacted to substitute at Mercer Elementary.(Doc.51 at 16-17).

Watson contends that in November 2002, Connelly told him that he was not being asked to teach at the elementary school because the other teachers were uneasy about his discrimination complaints. (Doc. 37-9 at 4) Later that month, Watson filed administrative claims alleging age discrimination with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission("EEOC").[4]

During the course of the administrative investigation, the District alleged that the decision not to hire Watson was based on his having been assigned the lowest composite rating of any candidate interviewed, a 1.0. The District contended that Watson demonstrated "poor professional writing skills," did not "share quality professional answers during his interview," did not "use his local advantage to support him in the interview," had previously expressed a preference for substitute rather than permanent teaching, and displayed "uncontrolled emotions in professional situations." (Doc. 51 at 38-47).

The administrative investigation concluded with a finding of no probable cause, and this action followed.

### III. Standard of Review

---

[4] The record before the court does not show that Watson filed administrative charges relating to gender discrimination.

-4-

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A "material fact" is one that "might affect the outcome of the suit." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248,(1986).

## IV. **The Discrimination Claims**

### A. **Burden of Proof**

When an age discrimination claim arises in the context of a failure to hire, the plaintiff is required to show that: (1) he was at least forty years of age; (2) he was qualified for the position sought; (3) despite his qualifications, he was not hired; and 4) a substantially younger person with equivalent or inferior qualifications was hired. Simpson v. Kay Jewelers, 142 F. 3d 639, 643 (3d Cir 1998).[5] If the plaintiff establishes a prima facie case, the defendant must offer evidence of a legitimate nondiscriminatory reason for the decision not to hire the plaintiff. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). "If that showing is made, the burden, which is now more significant, shifts back to the employee." Billet v. Cigna Corp.,

---

[5] Watson asks that he be granted summary judgment on the age discrimination claims based on his having established a prima facie case. Under the controlling McDonnell Douglas analysis, stating a prima facie case does not entitle a plaintiff to relief.

940 F.2d 812, 816 (3d Cir. 1991) abrogated in part on other grounds by St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993). The employee must then point to evidence that: (1) the legitimate reason articulated by his employer is not worthy of credence; or (2) the employer's action was more likely to have been motivated by discrimination. Sullivan v. Standard Chlorine of Del. Inc., 845 F. Supp. 167, 175 (D. Del. 1995).

The plaintiff's "evidence must be sufficient to support a reasonable inference that the explanation given for the employment decision is a pretext for discrimination." Id. (emphasis in original). Pretext is not established unless the plaintiff shows that the reason offered by the employer "was false, and . . . discrimination was the real reason." Id. (quoting Hicks, 509 U.S. at 512 n.4 (1993))(emphasis in original).

## B. Watson's Showing of Pretext

Given the minimal burden assigned to the District at this stage of the litigation and the District's explanation, set out above,"the court is satisfied that [it has] articulated facially legitimate reason[s]" for its decision not to hire Watson. Lewis v. University of Pittsburgh, 725 F.2d 910, 914 (3d Cir. 1983). The court must now determine whether the record contains evidence demonstrating that the Defendants' explanation was "in fact merely a pretext, i.e. a fiction which obscures the reality of

[age] discrimination." Id.

Establishing pretext "places a difficult burden on [Watson]." Fuentes v. Perskie, 32 F.3d 759,765 (3d Cir. 1994). In order to avoid summary judgment, he must show such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [Defendants'] proffered . . . reason[ ] for [declining to hire him] that a reasonable fact finder could rationally [find] it 'unworthy of credence.'" Id. (internal citation omitted)(emphasis in original). "It is not enough that he show that the Defendants' decision was wrong or mistaken, since the factual dispute . . . is whether discriminatory animus motivated the decision, not whether the [decision was] wise, shrewd, prudent, or competent." Id.

The law does not require that Watson discredit every rationale articulated by the District. "If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder." Tomasso v. Boeing Co., 445 F.3d 702, 707 (3d Cir. 2006)(quoting Fuentes 32 F.3d at 764 n.7). "The rejection of some explanations may so undermine the employer's credibility as to enable a rational fact finder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales." Id.

In attempting to establish pretext, Watson makes several arguments which the court considers seriatim:

## 1. <u>Inconsistencies in the Rating</u>

Watson recognizes that on the rating scale produced by the Defendants during the course of this litigation, he is "the only one out of thirty-seven interviewees who was given a rating lower than 2.0" (Doc. 48 at 6) He argues, however, that the District has been inconsistent in identifying his rank, thereby casting doubt on the ranking process and undermining the District's explanation for its hiring. In support of this argument, Watson contends that the Defendants' answer to the complaint filed with the Equal Opportunity Employment Commission ("EEOC")[6] fixed his score at 2.0, rather than 1.0. He also contends that French, one of his three interviewers, told him that he was one of the top ten candidates considered and "just missed" being hired.[7] (Doc. 48 at 6). Other candidates were simply "more enthusiastic."[8] Based on this information, Watson reasons that he must have been assigned a rank "somewhere between a 3.0 and 3.5" <u>Id.</u>

---

[6] Although Watson refers to this document, he does not provide its record citation. The court has not located this document but will assume, arguendo, that it reflects that Watson was assigned a score of 2.0. (The findings of fact made by the PHRC show that Watson received a 1.0)(Doc. 41 at 26).

[7] There is no evidence in the record corroborating the substance of any conversation that Watson had with French. French did not provide an affidavit, and was not deposed.

[8] Watson contends that the word "enthusiastic" is a youth-oriented adjective reflecting the District's preference for hiring young teachers.

Finally, Watson argues that the low rank assigned to him following his job interview is entirely inconsistent with letters of recommendation prepared on his behalf by Rhule and Connelly some nine months earlier in support of a full time teaching position in Houston, Texas. In a letter dated August 7, 2001, Rhule wrote that she was "impressed with [Watson's] ability to adapt and adjust to all situations without becoming stressed. He remains calm and positive within the school environment." (Doc. 37-7 at 17). Rhule described Watson as "patient," "compassionate" and "loyal," and reported that he was respected by the other teachers. Id. In an accompanying evaluation form, she ranked him as "clearly outstanding" - the highest ranking possible - in seventeen categories. Rhule gave Watson an overall rating of five, stating that he had worked under her supervision and she would hire him. (Doc. 51 at 32-33). Connelly also wrote a positive letter of recommendation, although his was more general and not based on personal observation. Watson argues that Rhule's highly laudatory recommendation for the Texas position is patently inconsistent with the views she expressed following his District interview. Watson contends that this vast variance is attributable to age discrimination.

## 2. **Rating Components**

### a. **Watson's Comparatively Poor Grades**

According to Watson, the record casts doubt on his overall rating, and on its component parts. First, Watson challenges the District's purported reliance on his undergraduate record as a factor in its decision not to hire him. Watson cites Mercer Employment Manual, Policy No. 402, claiming that it sets out the District's practice limiting consideration of undergraduate grades to the screening stage of the hiring process, when decisions regarding interviews are made. After the initial selection, other more subjective factors are considered. Watson contends that if the Defendants used his grades as a factor in deciding not to hire him, their actions were "inconsistent with the hiring policy that the Defendants were supposedly following." (Doc. 48 at 6).[9] Watson also argues that it is unlikely his grades were relevant to the decision not to hire him because Rhule's philosophy did not overemphasize grades.[10] Finally, Watson points to his scores on Praxis tests, a series of examinations designed to assess general knowledge in various

---

[9] Policy No. 402 provides that transcripts should be considered during the "paper screening" process, and that candidates with the most satisfactory evaluations following that process will be selected for interview.( Doc. 41 at 35). The letter sent to those candidates granted an interview stated, "[Y]ou have already distinguished yourself, as there were several hundred applications." Id. at 40.

[10] This argument is based on a February 2002 staff bulletin written and disseminated by Rhule. Watson has taken Rhule's comments out of context. In the newsletter, Rhule noted the exponential increase in applicants to the freshman class at the University of San Diego, and discussed a new admissions policy considering the "full complexity" of applicants, rather than their test scores alone. She commented that she disagreed with that policy.

areas of elementary education. He states that he scored higher than all of those hired, and that this should have placed him on equal footing with those candidates with respect to grades. (Doc. 52 at 15-27).

The District disputes Watson's analysis, arguing that it did not deviate from its own hiring policy. The policy does not provide that Praxis scores will be considered in the hiring process, or given weight equal to grades. (Doc. 54 at 12). Moreover, Rhule testified at her deposition that she ignored the screening process in Watson's case based on his oral representation that he had earned a 4.0 undergraduate average, and because of his long-time presence at the elementary school. (Doc. 44 at 12). Rhule testified that had she known the true status of Watson's undergraduate record, she would not have selected him to be interviewed. Id. at 12-17.

### b. Watson's Postal Service Termination

The District states that Watson's suitability for an elementary school teaching position was undermined by his contradictory explanations for the termination of his part-time employment with the United States Postal Service. Rhule contends that when Watson was asked about the reasons for the termination, he lost emotional control, telling her that the discharge was linked to his wife's spinal cord cancer and the number of times that he would have to miss work to care for her. (Doc. at 8). Watson's personnel file (Doc. 42 at 11) and his deposition

testimony establish that the situation was somewhat more complicated. In a written statement, Watson explained that he was discharged for "allegedly failing to follow an order." Id. He stated that he filed a grievance and was reinstated, but was discharged again for failing to report to work on the date specified in a late-arriving certified letter. Id.

In his deposition, Watson provided additional detail, explaining that prior to his first discharge, he suffered from back pain that had caused him to miss weeks of work. (Doc. 51 at 54). The Postal Service, on short notice, required that he report for a medical examination. He could not keep the appointment because he was unable to secure child care. Id. Because he did not report for the exam, he was discharged. Watson admitted that he had "welled up" when discussing his wife's cancer, but denied losing control.

Rhule was dissatisfied with Watson's explanations, believing that "there had to be issues beyond [his] missing one doctor's appointment due to an ill daughter." (Doc. 41 at 8). She observed that Watson did not seem to accept responsibility for his own role in the discharge, but instead assigned blame to his supervisors based on supposition regarding their reaction to his need for leave. Id. at 9. She also expressed concern that Watson's emotional display at the interview could indicate an inability to maintain composure and a sense of calm in the classroom.

Watson contends that his statements concerning his separation from the postal service were not inconsistent, and were largely irrelevant to his suitability for a teaching position. He maintains that Rhule's concern about his demeanor and reliability should have been alleviated by her extended observation of his teaching; her emphasis on his prior termination was inappropriate and indicative of pretext.

### c. <u>Subjective Evaluative Criteria</u>

Watson next challenges Rhule's conclusion that his application statements were poorly written and contrary to educational and school policy. Watson argues that his application alone received an intense level of spiteful scrutiny. For example, his essays were subjected to meticulous editing and analysis, while the other candidates' essays were not marked, dissected, or commented upon. This is significant, Watson says, because ratings resting on writing samples or interview responses are "subjective evaluations . . . susceptible of abuse and . . . likely to mask pretext." <u>Weldon v. Kraft, Inc.</u>, 896 F.2d 793, 798 (3d Cir. 1990). "Where [employment] decisions rely on subjective evaluations, careful analysis of possible impermissible motivations is warranted . . . ." <u>Liu v. Amway Corp.</u>, 347 F.3d 1125, 1136 (9th Cir. 2003). (Doc. 51 at 10).

### d. <u>Watson's alleged Preference for Substitute Teaching</u>

According to the District, the final factor relevant to its

decision not to hire Watson was his past preference for
substitute rather than permanent teaching. This ground for
defending the District's hiring decision is undercut by Rhule's
admission in her deposition that at the time she agreed to
interview Watson, she knew that he wanted a full time teaching
position.

### 3. Other Evidence of Pretext

The court has carefully evaluated each of the foregoing
arguments regarding pretext. Watson has succeeded in showing it
is unlikely that the District relied on every ground asserted in
support of its decision not to hire him. He has, to this point,
however, failed to adduce evidence adequate to support his
allegation of discriminatory animus. Watson contends that this
animus is evident only when the District's defense of its hiring
decision is examined against the background of other record
evidence. The court turns to this "other" evidence.

### a. Bias in Newsletters

Watson maintains that Rhule had an ageist bias that was
communicated to the elementary staff through periodic bulletins.
His argument rests primarily on two newsletters[11] distributed

---

[11] In a third undated newsletter, Rhule wrote that if reporters
were able to visit the school despite inclement weather, "[T]eachers
should have students behaving exceptionally well so that we are seen
as a place where 'the men are strong, the women are good looking, and
the children are all above average.' " (Doc. 51 at 48). Watson argues
that this familiar quotation from radio host, writer and humorist
Garrison Keillor was, in context, an ageist remark.

early in 2002 when legal analyst Greta Van Susteren was hired by
the FOX television network. Prior to her first appearance on FOX,
Van Susteren underwent and openly discussed cosmetic surgery.
Commenting on Van Susteren's surgery and attitude, Rhule wrote,
"I didn't see her new look on the FOX news, but I am amazed at
the picture that was in the paper. I like the fact that she was
so open about morphing into a new Greta. Go girl!" (Doc. 51 at
50). Some days later, another newsletter reproduced a syndicated
column criticizing Van Susteren for illustrating a "low-profile
cultural truth: How women look is more important than how they
think." Id. at 51. In an editorial comment printed next to the
article, Rhule disagreed with the columnist's opinion:
"Personally, I don't see this as a 'Barbie Doll wanna be' effort
as much as an effort to maintain and preserve a youthful
appearance. Age being another issue within our Peter Pan society
. . . All she did was have a new image fit the image of the
position." Id. Watson maintains that these comments demonstrate
that someone forty-seven years old did not fit Rhule's image of
an elementary school teacher.

**b. The District's Explanation was Formulated Post Hoc**

Watson contends next that the District's explanation for its
failure to hire him was a post hoc attempt to justify a decision
based on age discrimination. It is undisputed that the record
does not contain any evidence generated during the decision-
making process other than unmarked copies of each candidates's

application materials and a chart showing each candidate's overall rank. (Doc. 51 at 19). There are no data regarding how each criterion relevant to hiring was weighted. There is no information regarding the candidates' raw scores. There are no interview notes. The record is devoid of documentation regarding how one applicant compared to another in any category.

The documentation submitted by the District in support of its decision not to hire Watson is limited to what was compiled in response to the administrative investigation. (Doc. 51 at 21). The analysis of Watson's application is minutely detailed. Watson's undergraduate grades are broken down, summarized, and deemed not to be "indicative of a serious educator." Id. at 38. The "summary" of the circumstances surrounding his postal service termination comprises one and one-half single-spaced pages. His writing sample has been heavily edited for grammar and content. His failure to observe rules of writing mechanics "learned in first or second grade" were noted several times on his essays. (Doc. 41 at 18-21). Seven quotations from his written responses to interview questions were excerpted, analyzed, and criticized. Dr Rhule commented: "Mr. Watson's philosophy and educational strategies are neither reasonable nor applicable into [sic] real-life classroom situations." (Doc. 51 at 41). She also wrote:

> Mr. Watson's answers to the interview questions
> did not indicate current awareness of educational
> initiatives, programs, research, or practices.
> They were characterized by disjointed comments
> that were loosely tied together with a few

educational buzz-words . . . I have no idea of
[sic] where Mr. Watson surmised a preference
toward youthfulness in my daily writing, but my
bulletins do contain educational strategies,
issues, school initiatives, educational programs,
as well as daily information. Considering that
Mr. Watson read these bulletins and that he also
chose his own questions, he did not incorporate
much of the educational information into his
answers. His answers were indicative of a lack
of professional knowledge.

(Doc. 51 at 44).

Watson argues that all of the evaluative materials placed in
the record were crafted solely to disguise the fact that the
District's hiring decision was infected with age discrimination.
See Aufdencamp v. Irene Stacy Comm. Mental Health Ctr., 234 F.
Supp. 2d 515, 518 (W.D. Pa. 2002)(citing Lawrence v. Nat'l
Westminster Bank N.J., 98 F.3d 61, 66 (3d. Cir. 1996)
(stating that after the fact rationalization may constitute
evidence of pretext for discrimination).

It is clear that by the time the EEOC proceedings were
underway the District did not respect Watson. In fact, the
District's evaluation of Watson is so markedly negative that it
is difficult imagine why Rhule was willing to place him with
elementary school students at all, let alone on more than 300
days as a substitute teacher. It would be reasonable to expect
that some of these serious flaws detailed in documents prepared
by the District would have been apparent to anyone who observed
Watson's classroom performance on a regular basis.

The fact remains, however, that not all unfairness amounts

to actionable discrimination. "[A] post hoc [explanation] does
not in and of itself create a factual dispute about whether the
[explanation] was pretextual." Healy v. New York Life Ins. Co.,
860 F.2d 1209, 1215 (3d Cir. 1988). Even if Watson had been able
to demonstrate conclusively that the District fabricated each of
the grounds underlying its decision not to hire him and did not
actually rely on any of them, that showing would be insufficient
to defeat the District's motion for summary judgment. It is not
enough to "point to evidence that demonstrates there is reason to
disbelieve the explanation." Id. at 1215-16. Watson must also
identify record evidence showing that the District's conduct was
the result of age discrimination.

### c. Ruhle's Letter to Connelly

Watson contends and the court agrees that the most important
piece of evidence in the record bearing on the question of age
discrimination is a letter written by Rhule to Connelly three
days after the school board meeting at which Watson contends that
he first raised the issue of age discrimination. Rhule wrote:

> The percentage of people hired who are around
> [thirty-two] years of age or beyond is [thirty-
> eight percent]. Prior to this year's
> recommendations, the percentage of people
> hired who are beyond [thirty-two] was [fifty-
> six percent]. If there was any intended age
> discrimination, it was a preference for older
> teachers. All things being equal, I recommended
> the older applicants to fill in the age gaps so
> this staff would never be so lop-sided as it is
> now with the preponderance of people being in
> their late [forties]. This would support the
> transmission of school culture from one

> generation of teachers to the next as well as
> not break the bank with retirement costs. I say
> this only to you as I don't want to be accused
> of being age discriminatory with a preference
> toward older applicants.

(Doc. 51 at 35)(latter emphasis added). Despite Rhule's stated
preference for recommending older candidates, the District
concedes that Rhule, during her tenure as principal at Mercer
Elementary, recommended the hiring of no more than two candidates
over the age of forty.(Doc. 54 at 1). Watson contends that the
letter demonstrates that Rhule, although she disavowed
discriminatory intent, was well aware of the cultural and
financial impact of age in selecting an elementary school
faculty. She effectively admitted that she was unhappy with the
fact that so many of the elementary school's teachers were about
Watson's age.

## C. **The Legal Sufficiency of Watson's Showing**

Watson argues that he has adduced evidence sufficient to
discredit the legitimate reasons articulated by the District for
his rejection, and to suggest that the decision was the product
of age discrimination. The court agrees. It is convinced -
largely by the entirety of the Rhule letter - that Watson has
raised and supported an inference of discrimination sufficient to
defeat the District's Motion for Summary Judgment.

## V. **The Retaliation Claim**

A prima facie case of retaliation may be established

-19-

through direct or indirect evidence. <u>Fuentes v. Perksie</u>, 32 F.3d 759, 763-764 (3d Cir. 1994). Direct evidence of retaliatory animus is analyzed under the <u>Price Waterhouse</u> "mixed motives" framework. <u>See</u> <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989). Indirect evidence is analyzed under the <u>McDonnell Douglas</u> "pretext" line of cases. <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Watson has elected to proceed under a pretext analysis.[12] Accordingly, he must establish that: 1) he engaged in protected activity; 2) he suffered an adverse employment action after or contemporaneous with the employee's protected activity; and 3) a causal link exists between the protected activity and the adverse action. <u>Fasold v. Justice</u>, 409 F.3d 178, 188 (3d Cir. 2005).

Watson argues that he has established each of these elements. He states that he engaged in protected conduct when, in July 2002, he complained to Connelly that he had been the victim of age discrimination. He claims that Rhule took adverse action on the basis of his complaint, determining that she would not

---

[12] In a mixed motive case, the evidence produced by the plaintiff so clearly shows discriminatory animus that it is unnecessary to shift the burden of production. The burden of nonproduction and the risk of non-persuasion are borne by the defendant who must demonstrate that it would have made the same employment decision regardless of discriminatory animus. <u>Starceski v. Westinghouse, Inc.</u>, 54 F.3d 1089, 1098 (3d Cir. 1995). A plaintiff is not required to choose between these theories of recovery. He "may present his case under both theories and the district court must then decide whether one or both theories properly apply. . . prior to instructing the jury." <u>Id.</u> (citing <u>Armbruster v. Unisys</u>, 32 F.3d 768 at 782 n.17(3d Cir. 1994) <u>abrogated on other grounds by</u> <u>Smith v. Borough of Wilkensburg</u>, 147 F.3d 272, 277 (3d Cir. 1998).

call him again to substitute teach at the elementary school.[13]
Finally, he argues that a portion of the letter written by Rhule
to Connelly three days after Watson complained demonstrates
causation:

> Unless a teacher specifically asks for Eldon,
> I do not intend to call him for substitute
> work. My explanation is that I feel uncomfortable
> with his assessment of the district hiring
> practices and my recommendations. Since he
> has threatened to sue us, I do not feel
> comfortable giving him an opportunity to
> gather information that can be used against
> the district. I resent his statements that
> attack my professionalism in the interviewing
> process. I don't trust him.

(Doc, 51 at 35). Rhule testified that when she wrote the letter,
she knew that Watson had threatened to sue the District for age
discrimination.(Doc. 51 at 36).[14] According to Watson, Rhule
adhered to this decision. Although he had taught an average of
eighty-three days during each of the academic years 1999-2000
through 2001-2002, Rhule called him only once in academic year
2002-2003 to fill in for a cafeteria worker, not to substitute

---

[13] At least one court has held that a defendant's refusal to
continue using a qualified plaintiff as a substitute teacher
constitutes an adverse employment action. See Lautermilch v. Findlay
City Schools, No. 300CV7248, 2001 WL 631329 at * 6 (April 9, 2002 N.D.
Ohio).

[14] The parties do not dispute that immediately after Connelly
received Rhule's letter, he called her, told her that Watson had the
right to sue the District, and that she should continue to call Watson
as a substitute.

teach.[15] She did not call him at all after administrative charges
were filed.

The District challenges the adequacy of Watson's prima facie
case, arguing first that he did not engage in protected activity.
"To show that [he] engaged in protected activity, the plaintiff
must show that [he] opposed a practice made unlawful by . . . the
ADEA. 42 U.S.C. §2000e(a); 29 U.S.C. §623(d)." Bartholomew v. St.
Luke's Hospital - Allentown Campus, No. Civ. A. 02-2876, 2003 WL
21250561 at * 5 (April 29, 2003). According to the District,
Watson's statements at the school board meeting were general
complaints about the fairness of the hiring process. Furthermore,
they argue, even if Watson did challenge discriminatory
treatment, Rhule was not aware that he had done so.

The record does not support these arguments. Where and how
Watson complained about age discrimination is irrelevant. The
Court of Appeals for the Third Circuit has held that "[i]t is
neither necessary, nor appropriate to define with precision the
type of conduct that will give rise to a retaliation claim under
the ADEA . . . [W]e analyze the message . . . conveyed, and not
the medium of conveyance." Barber v. CSX Distribution Services,

---

[15] Rhule contends that she intended that Watson stay for the
afternoon, and receive pay at the substitute rate. It is not clear
whether Rhule called Watson a second time to report on October 4,
2002, or whether arrangements were made months earlier directly by the
teacher. In any event, Watson did substitute on that day. (Doc. 37-7
at 9).

68 F.3d 694, 702 (3d Cir. 1995).[16] Watson's message centered on age discrimination, and it is clear that Rhule received that message, from whatever source, and intended to act on it when she wrote the letter to Connelly.

The District next argues that Rhule did not engage in retaliation. Instead, she had a legitimate nondiscriminatory reason for not calling Watson to substitute. According to Rhule, both Watson's wife and Watson himself notified her that he no longer wanted to be called as a substitute at Mercer Elementary; she simply honored his request. Watson vehemently denies that he or his wife ever asked that he not be called, and alleges that Connelly confirmed to him that he was not being called because other teachers did not want to work with him.

Because of this genuine issue of material fact as to whether Watson's exclusion from the elementary school substitute list was effected for a legitimate reason, the parties' motions for summary judgment with respect to the retaliation claims should be denied.

---

[16] The District also challenges Watson's retaliation claim on the ground that any July complaint about age discrimination protected lacked a good faith objective basis. See Hopson v. Dollar Bank, 994 F. Supp. 332, 342 (W.D. PA. 1997). Although the court has recognized that the record evidence of age discrimination is far from overwhelming, it cannot say that Watson did not have any objective ground for believing that he had a victim of age discrimination. In any event, the District concedes that Watson's November 2003 administrative filings were protected conduct.(Doc. 39 at 11-12). The record shows that Watson was not called to substitute at the elementary school at any time after those charges were filed.

## VI. **Conclusion**

Because the Plaintiff is not entitled to relief based on his ability to establish a prima facie case of age discrimination under the ADEA, and because material questions of fact exist with respect to each of the remaining grounds asserted in support of both parties' motions for summary judgment, the motions (Docs. 35 and 38) should be denied in their entirety.

In accordance with the Magistrate's Act, 29 U.S.C. §(b)(1)(B), 636 (b)(1)(b) and (c), and Rule 72.1.4 (B) of the Local Rules for Magistrates, objections to this Report and Recommendation are due by November 9,2006. Responses to objections are due by November 20, 2006.

October 24, 2006

  /s/ Francis X. Caizazza
Francis X. Caiazza
U.S. Magistrate Judge

cc:
Counsel of Record
Via Electronic Mail

-24-