**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


ELDON N. WATSON, III,        )
                                        )
                Plaintiff,      )       Civil Action No. 05-212
                                          )
      v.                          )       Magistrate Judge Caiazza
                                          )
DR. LAWRENCE CONNELLY,    )
*et al.*,                              )
                                          )
               Defendants.   )


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

      Having conducted a bench trial in the above-captioned case, the court now enters these findings of fact and conclusions of law.

      The court will utilize the narrative voice, rather than numbered findings and conclusions. Where any doubt may arise, the undersigned will specify whether the determination is made by the court sitting as finder of fact or as a matter of law.

      The trial transcript has been filed, on a daily basis, under separate docket numbers. In citing the transcript, the court will refer to the docket number corresponding to the date of the transcript, then a period ("."), followed by the specific page number(s). After each entry will appear the identity of the witness. Thus, the testimony of Eldon Watson, appearing on the hundredth page of the transcript dated January 14, 2008 (Doc. 68), will be cited "Tr. at 68.100 (Watson, E.)."

      The facts in this case are familiar to the parties, so the court will restrict its discussions to those most germane to its conclusions.

## I.       Overview

### A.       The Plaintiff's Allegations and General Background Facts

The Plaintiff Eldon N. Watson, III, alleges age discrimination under the ADEA, and age, gender discrimination and retaliation under the PHRA. *See generally* Am. Compl. (Doc. 11) at Counts I-IV. Mr. Watson complains of the Defendants' failure to hire him for any of five permanent elementary school teaching positions offered by the Mercer Area School District ("the School") in Spring 2002. *See generally* Joint Stipulated Facts (marked as Court Ex. 1 and filed herewith under Appendix A) at ¶¶ 17, 22, 25, 31, 34.[1]

Named as Defendants are the School, former Principal Dr. Michelle Rhule, and former Superintendent Dr. Lawrence Connelly. Dr. Rhule had primary responsibility for selecting the candidates, Tr. at 68.169-70 (Rhule), and the Plaintiff was one of thirty-six applicants (out of a pool of over three hundred) chosen for an interview. *See id.* at 68.176; Stipulated Facts at ¶ 17.

The interviews were attended by Dr. Rhule, Assistant Principal Cynthia Portman, and School Board member Albert French. *See generally* Tr. at 68.124 (Watson, E.). Immediately following his interview, the panel gave Mr. Watson a score of "one" out of five, the lowest assessment a candidate could receive. Tr. at 68.195 (Rhule). The Plaintiff was forty-seven years of age. Stipulated Facts at ¶ 10.

---

[1] Mr. Watson also has referenced the School's failure to hire him as a permanent teacher in January 2003 and thereafter. *See generally* Am. Compl. at ¶ 16 (noting younger individual was hired in Jan. 2003); Tr. at 68.17-18 (Watson, C.) (discussing Plaintiff's application for permanent teaching position in 2004). Nearly all of the evidence introduced at trial addressed the positions filled in Spring 2002, and the factfinder otherwise concludes that the Plaintiff has failed to prove discrimination or retaliation in 2003-2004.

The successful candidates all were female, and they ranged in ages between eight and twenty-five years younger than Mr. Watson. *Id.* at ¶¶ 22-23, 25-26, 28-29, 31-32, 34-35.

The Plaintiff proceeds under the "pretext" theory of discrimination. *See generally* Pl.'s Mot. in Limine (Doc. 64) at 3. He has attempted to show that the School's proffered legitimate reasons for his non-selection were a pretext for unlawful age and gender discrimination. *See id.*

The Plaintiff also alleges that, based on his complaints of discrimination, the School retaliated by failing to employ him as a substitute teacher beginning the Fall of 2002.

**B.    Legal standards**

The Plaintiff must show by a preponderance of the evidence that the Defendants' discrimination or retaliation was "a determinative factor" in the adverse employment action. Watson v. Southeastern Pa. Transp. Auth., 207 F.3d 207, 215 (3d Cir. 2000) (trial standards in pretext case, citations omitted).[2]

"The role of determining whether [an] inference of discrimination is warranted" remains "within the province of the [factfinder], because a finding of discrimination is at bottom a determination of intent." Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1071-72 (3d Cir. 1996) (citations omitted). In this bench trial, the court performs the jury's "traditional

_____

[2] Although Plaintiff's counsel has not advanced the "mixed motives" theory under *Price Waterhouse*, the alleged statements of Albert French may implicate it. *Compare* Fakete v. Aetna, Inc., 308 F.3d 335, 338-39 (3d Cir. 2002) (under *Price Waterhouse*, plaintiff presents "[d]irect evidence" that decision makers "placed substantial negative reliance on [age] in reaching their decision") (citations and some internal quotations omitted) *with* Tr. at 68.80 (Watson, E.) (Mr. French allegedly told Plaintiff successful candidates were "more enthusiastic"). Assuming this theory applies, Mr. Watson has failed to show discriminatory animus was a "substantial motivating factor" in his non-selection. Watson, 207 F.3d at 215 (trial standards for mixed motives case, citation omitted).

function of assessing the weight of the evidence, the credibility of the witnesses through observation of both direct testimony and cross-examination . . ., and the strength of the inferences that can be drawn from the elements of the *prima facie* case and . . . the employer's proffered reasons for its actions." *Id.*

## II.     The Plaintiff, His Wife, and Their Credibility As Witnesses

Mr. Watson was born on April 6, 1955.  Stipulated Facts at ¶ 8.  He attended Geneva College from the Fall of 1973 until May 1978, where he pursued a major in elementary education.  Tr. at 68.59 (Watson, E.).  The Plaintiff ceased matriculation before receiving a degree, and he carried a grade point average ("GPA") of 2.299.  *See* Pl.'s Ex. 2 (Geneva College transcript).

Mr. Watson became an employee of the United States Postal Service in 1987, and he worked there until being discharged ten years later.  *See* Tr. at 68.60, 68.62 (Watson, E.).  During his tenure, he met and married his co-worker Cyndi Watson.  *See* Tr. at 68.9 (Watson, C.).

Around the same time Mr. Watson lost his job, his Wife was diagnosed with spinal cancer.  *Id.* at 68.10.  Given Ms. Watson's health concerns, the couple decided the Plaintiff should complete his degree and pursue a job in teaching.  *Id.* at 68.11.

The Plaintiff returned to school, and graduated in 1999 with a degree in elementary education.  Tr. at 68.65 (Watson, E.).  Mr. Watson performed better this time, raising his overall GPA to 2.71.  *See* Pl.'s Ex. 2.

After receiving his teaching certificate, the Plaintiff began substitute teaching for the School. *See* Stipulated Facts at ¶ 41. Mr. Watson "subbed" no fewer that 95 days during the 1999/2000 school year; no fewer than 75 days in 2000/2001; and no fewer than 79 days in 2001/2002. *Id.* at ¶¶ 42-44. It is undisputed that the Plaintiff was a good substitute teacher and was well liked by the Defendants. *See, e.g.*, Tr. at 68.181 (Rhule) (Mr. Watson "performed very well in that position").

The record contains three applications submitted by Mr. Watson to the School: one in 1999 for substitute teaching work; one made in connection with the permanent positions in Spring 2002; and one in 2004. *See* Pl.'s Ex. 5 (applications); Tr. at 68.12-13, 68.37 (Watson, C.) (identifying same). The Plaintiff's Wife admits that she played a substantial role in generating these documents, and she signed the 2002 application, its cover letter, and other materials on his behalf. *See* Tr. at 68.41, 68.51-52 (Watson, C.) (Wife signed 2002 application and cover letter); Tr. at 68.113-14 (Watson, E.) (same for 1999 application statement regarding Plaintiff's discharge from Postal Service).

There are discrepancies between the GPAs reported on the Plaintiff's various applications. His 1999 application accurately reflected a GPA of 2.71 for Geneva College, but inaccurately reported 4.0 for Westminster College, *see* Pl.'s Ex. 5; his 2002 application continued to inaccurately report Westminster as 4.0, *see id.*; and his 2004 application correctly stated a Westminster GPA of 3.5, but inflated his Geneva average to 2.9. *See id.*

The factfinder also concludes that, in all three applications and his 2002 cover letter, Mr. Watson exaggerated the nature of his supervisory responsibilities at the Post Office. *See* Pl.'s Ex. 5 (applications stated Mr. Watson served as "a Supervisor" for two and 1/2 years to

three years, "supervising as many as 60" or 75 employees); Ex. 3 (2002 cover letter, stating he worked as "a Supervisor" "during 4 of [his] 10 years"). At trial, the Plaintiff testified:

> The Postal Service offered a plan that was called a 204-B program. It was . . . training . . . in the skills of being a supervisor. . . . [O]nce in the program, . . . you were eligible to fill in on a daily, weekly, [or] monthly basis as needed. . . . [I]n the two-and-a-half to three year period that I [was in the program,] a low estimate [of the Plaintiff's actual supervising tenure] would have been [approximately] fifteen weeks . . . .

Tr. at 68.60-61 (Watson, E.).

Although the Watsons testified the application statements were accurate in their eyes, the factfinder believes it more likely than not that the Plaintiff engaged in resume puffery.

Also undermining the Watsons' credibility are their explanations regarding the inconsistent GPAs. Although these witnesses attributed the discrepancies to human error and lack of attention, *see, e.g.,* Tr. at 68.14-18, 50 (Watson, C.), the factfinder concludes that they knew or should have known the applications overstated Mr. Watson's grades. *See* discussions *supra*; *see also* Pl.'s Ex. 3 ("[f]rom 1997-1999[,] I . . . attended college at Westminster and Geneva and . . . carried a GPA of 4.0").[3]

Last is Ms. Watson's role in drafting the applications and her signing documents on the Plaintiff's behalf. The Watsons' explanations are all over the place, and it is not credible that Ms. Watson drafted certain documents, handed them to the Plaintiff for his review,

---

[3] Plaintiff's counsel has highlighted that successful candidate Andrea Wilds reported a "3.6 Major [G]PA," while her overall GPA was only 3.2. *See* Tr. at 69.31-33 (Rhule); *compare* Defs.' Ex. E (Ms. Wilds' application) *with* Pl.'s Ex. 54 (Ms. Wilds' school transcript). This candidate indicated the 3.6 GPA related to her "[m]ajor," and the factfinder concludes that Mr. Watson's inaccuracies were less justified and more significant. Even assuming the contrary, Ms. Wilds' credibility is not an issue in this case, and the court addresses the Plaintiff's applications only within that context.

and he handed them back to his Wife for signature. *See, e.g.*, Tr. at 68.36 (Watson, C.) (Plaintiff "might" sign something she wrote without reviewing it, but "[h]e probably did" review 1999 application); *id.* at 68.41 (regarding 2002 application, Plaintiff "reviewed it, looked at it, and I signed [it]"); Tr. at 68.102-103 (Watson, E.) (although Wife signed 2002 cover letter, she did so "with [his] permission"; "I should have [read it], and I probably skimmed through it"); *id.* at 68.114-15 (regarding 2002 application his Wife signed, "I read it, I read it."). Common sense dictates that, had Mr. Watson actually reviewed these materials, he would have contemporaneously affixed his signature.

To be clear, the Defendants did <u>not</u> rely on the discrepancies in GPA reflected in the several applications, nor do they claim the Plaintiff's exaggeration of previous supervisory responsibilities led to his non-selection. The above evidence, however, undermines the Watsons' credibility, and their testimony proves more detrimental than the underlying transgressions.[4]

## III. <u>The Plaintiff's Discrimination Claims</u>

### A. <u>Mr. Watson's Interview</u>

According to his Wife, "Eldon . . . said that he had a very good interview," and this prompted the Watsons to further investigate the circumstances surrounding his non-selection.

---

[4] The factfinder also believes that Mr. Watson's failure to generate and sign his own application materials is consistent with the School's conclusion he was not a particularly strong candidate. To the extent the Plaintiff was not sufficiently motivated or capable of generating (or at least carefully reviewing) his applications, this bolsters the Defendants' testimony regarding the insightfulness of his interview responses. *See, e.g.*, Tr. at 68.190-91 (Rhule) (Mr. Watson "answered on a surface level," and his responses lacked "depth"); Tr. at 69.43-44 (Portman) (witness was concerned by Plaintiff's interview statement "that he didn't agree with the state [educational] standards"; "we had to teach the state standards, according to the Pennsylvania Department of Education; and for a teacher to say that he didn't agree with that, that would be a concern to me as an administrator").

Tr. at 68.24 (Watson, C.). The Plaintiff's beliefs regarding his performance were not well founded.

The Plaintiff admits that, given his Wife's health concerns, he became emotional during the interview:

> Q.      What was your state of mind at the beginning of the interview?
>
> A.      Well, at that point in time when I talked about my [W]ife's cancer, . . . . [t]hat was a really scary time; and I would say that my . . . eyes welled up, but at no point did . . . a tear roll down my cheek.
>
>         . . . .
>
> Q.      Do you recall Dr. Rhule giving you the opportunity to compose yourself before you continued?
>
> A.      She said[,] . . . 'Would you like to stop?' And I said, 'No, I'm fine.'

Tr. at 68.77, 68.129 (Watson, E.).

Dr. Rhule's testimony is largely consistent:

> I said, 'Tell us a little bit about yourself.' And at that point Eldon began to cry, and it was painful. So I said to him, 'Do you need more time?' . . . . And he said, well, he just hadn't thought he'd react like this. I said, 'Well, take a few minutes.' . . . [A]fter . . . maybe a minute, then he said, 'Well, I'm all right[,]' . . . [a]nd then he started to [answer].

Tr. at 68.187-88 (Rhule); *see also* Tr. at 69.43 (Portman) ("[T]he interview began with: Tell a little bit about yourself. And he talked about . . . his experience at the [P]ost [O]ffice, and that he wasn't able to continue that employment because of his wife's cancer, at which . . . time he began to cry.").

As a matter of credibility, the factfinder believes the Defendants' version of events is likely more accurate. The issue does not turn, however, on whether Mr. Watson was able to contain his tears. By the Plaintiff's own testimony, he became emotional during the interview, the panel perceived it, and Dr. Rhule questioned his ability to continue.

The Defendants consistently have maintained that Mr. Watson's display of emotion reflected unfavorably upon his candidacy. *See, e.g.*, Pl.'s Ex. 45 (ltr. of Dr. Rhule to Dr. Connelly explaining non-selection) at 1 ("[h]e was semi-crying and said several times that he hadn't anticipated that he would respond like that"); Pl.'s Ex. 48 (Dr. Rhule's "Verified Statement of Non-Selection") at pg. B-83 ("Mr. Watson displayed uncontrolled emotions in professional situations"); Tr. at 69.46 (Portman) ("I was quite concerned about his crying during an interview, and I expressed that to the interview committee . . . . I felt that if [this] was an area . . . that could cause emotionality . . . [one] would [not] want to bring up in an interview. I just saw a loss of emotional control as . . . an issue for a teacher.").

Irrespective of the sympathy the factfinder may feel for Mr. Watson, the Defendants were entitled to view the Plaintiff's demeanor unfavorably. The court does not believe it reasonable for a person to conclude he had "a very good interview" when it began with an uncontrolled, if understandable, display of emotion.

The court also finds highly credible the interview panel's negative reaction to certain substantive answers supplied by Mr. Watson. In addition to the comments referenced above (*see* fn. 4), the factfinder joins the Defendants in concluding that the Plaintiff's claimed preference for home schooling was highly problematic. *See, e.g.*, Tr. at 68.190 (Rhule) ("[H]e [was] talking about home schooling, and [said] home schooling is not an option for most people here, so this is

the next best thing. . . . [O]bviously he believed home schooling was better than the position that he was [seeking, which involved] . . . educating other people's children."); Tr. at 69.45 (Portman) (confirming, based on review of notes taken during interview, Plaintiff's comments regarding home schooling); Pl.'s Ex. 48 (Dr. Rhule had "a real problem adding someone to [her] staff who [felt] that public education [was] . . . second best"). The Plaintiff has not denied making these statements, and the court has no reason to believe the Defendants are making them up.

In sum, the factfinder concludes by a preponderance of the evidence that Mr. Watson's interview performance motivated his non-selection, not unlawful discrimination based on age or gender.

### B.   The Plaintiff's Evidence of Pretext

1.   Although Dr. Rhule's Post-Hoc Rationalizations Diminish Her Credibility, They Do Not Modify the Conclusion that Mr. Watson's Non-Selection Was Motivated by His Interview Performance.

To be sure, Dr. Rhule responded to the Plaintiff's claims of discrimination with post-hoc rationalizations not advanced through her testimony or reflected in the interview notes. *See, e.g.*, Pl.'s Ex. 48 (criticizing among other things Mr. Watson's explanation for his discharge from Postal Service, his written application statements, and poor writing skills, and claiming he did not really want to teach full time). Dr. Rhule's after the fact, litigation-minded posturing is unfortunate, and it undermines her credibility generally.

Nevertheless, the record on the whole establishes by a preponderance of the evidence that the Defendants had legitimate non-discriminatory reasons for the Plaintiff's non-selection. *See* discussion *supra*; *cf.* Lewis v. University of Pgh., 725 F.2d 910, 925 n.5 (3d Cir. 1983)

("The trier of fact should consider <u>all the evidence</u>, <u>giving it whatever weight and credence it</u> <u>deserves</u>.") (citation omitted, emphasis added).

>    2.    Drs. Rhule and Connelly's Provision of Favorable Letters of
>           Recommendation

The Plaintiff's letters of recommendation were based on his substitute teaching performance. *See, e.g.*, Tr. at 68.179-81 (Rhule) (testifying same and highlighting that substitutes, unlike permanent teachers, were not subjected to state-mandated observation and evaluation); Tr. at 69.55 (Connelly) (Plaintiff received positive recommendation because "he was reliable, dependable, [and] on time; typical things you would like to see from a substitute teacher"). The court finds these explanations credible, and there is no evidence of pretext.

>    3.    <u>Mr. French's Purported Reference to "Enthusiasm"</u>

The Plaintiff testified:

> Q.    [U]pon learning that you didn't get the full-time teaching job . . .,
>       what, if anything, did you do?

> A.    [T]he very first thing I did was call . . . Mr. French. . . .  I wanted to
>       get some pointers from him as to maybe what I could do better . . .
>       [in] future interviews.

> Q.    What did he relate to you?

> A.    He told me that I had a very good interview, that though I wasn't
>       . . . in the top to be hired, that I was, in his recollection, the tenth or
>       eleventh person on his list; and that I did all right, and that I should
>       do well in future interviews. . .  [T]he last thing he told me . . . was
>       I could have been a little bit more enthusiastic.  He [said], 'Not that
>       you weren't enthusiastic, but the applicants that we hired were
>       more enthusiastic.'

Tr. at 68.79-80 (Watson, E.).

To the extent the Plaintiff suggests Mr. French's purported comments evidenced pretext or age bias, the factfinder remains unconvinced. Dr. Connelly testified credibly regarding the School's desire to maintain good relations with substitute teachers:

> Being a substitute tended to give you the opportunity to interview.
> Obviously, in a small school district especially, interviewing subs
> is very, very important because you tend to want to keep a positive
> relationship with them. And it's not unusual when people don't
> get hired, that they quit subbing for you and leave . . . . [O]ne of
> our goals was to try to keep those people there. We needed them.

Tr. at 69.56 (Connelly).

These observations are consistent with human experience, and the factfinder would be unsurprised by Mr. French's purportedly handling the Plaintiff with "kid gloves" under the circumstances. Assuming the statements were made, moreover, the court does not find the term "enthusiasm" to be code-speak for youth, especially given Mr. French's suggestion the Plaintiff could do better in the future.

Finally, none of the comments attributed to Mr. French cause the factfinder to modify its conclusion that the Plaintiff's non-selection was motivated by his interview performance.[5]

---

[5] Similarly, the court does not find persuasive the Plaintiff's suggestion that ageist tendencies were reflected in Dr. Rhule's letter to Dr. Connelly regarding Mr. Watson's non-selection. *See* Pl.'s Ex. 45 at 2 ("All things being equal, I recommend[] . . . older applicants to fill in the age gaps so this staff [will] never be so lop[sided] as it is now with the preponderance of people being in their late 40's.") (emphasis in original omitted); *see also id.* (referencing concerns regarding retirement costs associated with younger workers). Although the Plaintiff apparently suggests the "lady doth protest too much," the factfinder already has concluded that Ms. Rhule's inappropriate responses to his discrimination claims do not undermine the Defendants' legitimate concerns regarding his candidacy.

4. Evidence Regarding the Age of Successful Applicants During Dr. Rhule's Tenure

The factfinder rejects the Plaintiff's anecdotal evidence that younger teachers were preferred. *See* Pl.'s Ex. 7. At least some persons within the protected class (age forty or above) were accepted, *see id.*, and the Plaintiff has failed to demonstrate statistical significance. No measure of statistics, moreover, can overcome the legitimate reasons for non-selection identified above.

5. The Excerpts of Dr. Rhule's Teacher Newsletters Do Not Establish Ageism or Gender Bias.

The Plaintiff's reliance on Dr. Rhule's newsletter excerpts is particularly lacking. *See* Pl.'s Ex. 46. At best, the newsletters evidenced a person with unusual priorities. *See, e.g., id.* at bates stamp number WAT0019 (attaching and commenting on newspaper article regarding Greta Van Susteren's "makeover"). There is no credible evidence of discriminatory animus or pretext.

## IV. The Plaintiff's Retaliation Claims

### A. Background

Mr. Watson first voiced allegations of age discrimination during a public School Board meeting in July 2002. Tr. at 68.81 (Watson, E.) ("at [the] meeting[,] I expressed to Dr. Connelly that I felt that the sole reason that I wasn't hired was . . . my age"). Dr. Connelly testified:

> I know he spoke about not being hired, . . . I think he asked specifically, . . . 'Could you tell me something' at the open public meeting. . . . I think I replied, 'We don't discuss personnel issues in open public meetings,' or something of that nature . . . [M]ost school boards don't discuss hiring[ decisions] at open public meetings.

Tr. at 69.56 (Connelly).

Dr. Rhule testified credibly regarding her reaction:

> I was angry and I was hurt and I felt I had been portrayed in a very
> poor light and it was unfair. . . .
>
> . . . .
>
> [H]e had stood up at a meeting without giving me any notice that
> he was going to do [so] and . . . attacked what was happening in the
> process . . . [H]e had never given me any [prior] indication that he
> was dissatisfied . . . .

Tr. at 69.6, 69.9 (Rhule).

A couple of days later, Dr. Rhule sent a letter to Dr. Connelly attempting to demonstrate

the Plaintiff's non-selection was not motivated by age. *See* Pl.'s Ex. 45. She closed her letter by

saying:

> Unless a teacher particularly requests . . . Eldon, I do not intend to
> call him for substitute work. . . . I feel uncomfortable with his
> assessment of the district hiring practices and my
> recommendations. Since he has threatened to sue us, I do not . . .
> [want to] giv[e] him an opportunity to gather information that can
> be used against the district. I resent his statements . . . attack[ing]
> my professionalism in the interviewing process. I don't trust him.

*Id.*

Dr. Connelly testified that he rebuffed Dr. Rhule's comment, directing that the Plaintiff

should continue to enjoy subbing opportunities. Tr. at 69.58 (Connelly) ("I told her she couldn't

do that. . . . It was inappropriate[ and un]fair to Eldon, . . . [and] it was something she just

needed to get over.").

-14-

In September 2002, the School called Mr. Watson's home to ask whether he would act as a substitute cafeteria monitor. Although the witnesses presented different accounts, the court finds most credible the testimony of School secretary Linda Ryan:

Q.	[W]hat happened on September the 16th regarding your call to Eldon Watson about substituting[?]

A.	Well, in the morning one of the cafeteria monitors was sick, and . . . we needed to get a substitute . . . . So Mr. Watson's home number was called and Mrs. Watson answered the phone. . . . I . . . identified myself[ and] the [S]chool, and I . . . asked if Mr. Watson was available to substitute as a cafeteria monitor.

. . . .

Q.	[How d]id Mrs. Watson respond to you?

A.	[S]he asked me to repeat the school. She asked . . ., 'What school is this?' And I replied, 'Mercer Elementary.' And she said, 'Oh, no. He won't do that.' . . . She did not ask me to clarify the job. She asked me to clarify what school I was calling from.

Q.	Why did you prepare [the] note [submitted as Defendants' Exhibit A, memorializing the discussion]?

A.	. . . . I wrote this because I was kind of surprised that . . . this was the response. . . . I wrote a note to that effect.

Tr. at 68.156-159 (Ryan).

The Plaintiff last acted as a substitute on October 4, 2002. *See* Tr. at 68.131-32 (Watson, E.). The same day, Mr. Watson approached two teachers for whom he had previously substituted, Karen Crooks and Denise Campbell. According to the Plaintiff,

> I was on break time, and I saw Mrs. Crooks and Mrs. Campbell
> going into Mrs. Campbell's room. . . . I thought it would be a good
> opportunity to talk to them both since they were on break also. . . .
> They had been so kind and so dear to me that I wanted to . . .
> give them the courtesy [of] let[ting] them know what was going on
> . . . . [M]y general opinion was they were very afraid of Dr. Rhule.
> So I . . . . told them that . . . if they felt the need not to talk to me at
> the lunchroom or . . . in the halls or say hi, I completely
> understood; and that was the end of the conversation.

Tr. at 68.83-84 (Watson, E.).

Dr. Rhule, on the other hand, concluded Mr. Watson was harassing these teachers, "trying to gather information relative to this lawsuit." Tr. at 69.70 (Connelly). Her stated belief is bolstered by the testimony of Dr. Connelly, a witness less personally invested in the dispute, more level headed, and therefore more credible. Dr. Connelly testified:

> [At some point] . . . Mr. Watson called me[, and the
> communication] . . . became very heated . . . on his part . . . .
> [W]e talked about him subbing[, and] . . . I had mentioned that I
> was unhappy with his talking to the teachers at the elementary
> school while he was working for the School District; and he
> became kind of angry with me about that because he believed that
> was his First Amendment right[] or something of that nature. . . .
> I made the point to him that, 'Well, I don't care if you talk to them,
> but when you're working for us, I don't want you to do anything to
> disrupt the educational process and . . . put any stress on the other
> staff members, so I prefer you not do that.'

Tr. at 69.59 (Connelly).

Another incident arose in late October 2002, when the Plaintiff went to pick up his daughter from the School. *See generally* Tr. at 68.85-88 (Watson, E.). Mr. Watson learned that a student teacher had been attending to his daughter's class, and he wondered why he had not been called in to substitute. *See id.* The Plaintiff telephoned Dr. Connelly and requested an

-16-

investigation, to which the Superintendent replied:

> [The permanent teacher] had to leave the building due to a family emergency[, and] Dr. Rhule decided to [have the student teacher cover the class between 1:00 p.m. and 2:40 p.m.].
>
> . . . .
>
> Board policy [dictates] that [a] student teacher should not be left alone with the students for more than half the time.
>
> Supervisors from both Slippery Rock University and Grove City College have [stated] that the action of covering a class while under the supervision of a cooperating teacher is not inappropriate for a student teacher in her ninth week of practice. In this case [a] cooperating teacher[, not the one that had left,] was present . . . .
>
> Although the supervisor was not in the room the entire time, she agreed to supervise her student teacher while she was 'covering' the class. Also, Dr. Rhule made two . . . trips to [the] classroom and provided additional over[]sight . . . .
>
> Finally, the incident [that] occurred is very rare and not a 'practice.' . . . [C]ommon sense dictates that the option applied [was] not unreasonable and in this case [was] . . . the logical thing to do . . . .

Pl.'s Ex. 30 (Dr. Connelly's ltr. to Plaintiff dated Nov. 1, 2002).

Mr. Watson replied via letter dated November 6th:

> I absolutely did not tell the student teacher I was going to call her college and tell them [the School is] using student teachers . . . instead of substitutes . . . . That is both absurd and pointless. . . . I told her [only that] I was a substitute and they hadn't contacted me. . . . Certain individuals are grossly misleading you with deception that has vilely impinged upon my character. . . .

It is a distressing occurrence in society when the mere exercising of
individuals['] 'right to due process' can escalate into such
unprofessional retribution. This vengeance is a result of the
various forms of misinformation you are receiving from an angry
pungent source at the elementary school. It has eliminated my
work completely . . . as you informed me so yourself on October
30th during our phone conversation[, when Dr. Connelly allegedly
stated Mses. Crook and Campbell felt uncomfortable with him
subbing]. I respect your professionalism in spite of the position
you are in and pray that it imposes itself upon your subordinates
and[,] further, affiliates of the [S]chool [B]oard.

Pl.'s Ex. 31.

On November 21, 2002, the Plaintiff sent a letter to the Board requesting a hearing.

*See* Pl.'s Ex. 32. Mr. Watson sought to have his counsel cross-examine Dr. Rhule, the teachers

"that alleged [he] was 'harassing' them," and the student teacher referenced above. *See id.*

The School District's solicitor responded that a hearing would not be forthcoming.

*See* Pl.'s Ex. 33.[6]

After October 4, 2002, the Plaintiff was not called by the School to substitute teach;

this was true despite his name having remained on the substitute teachers list. *See* Stipulated

Facts at ¶ 45.

_____

[6] The record is unclear regarding when the Plaintiff first contacted the EEOC. Mr. Watson
testified it was in July 2002, *see* Tr. at 68.132-33, but his pleadings appear to indicate that
administrative procedures were only set into motion after November 2002. *See* Am. Compl.
at ¶¶ 21-28. Ultimately, the issue is immaterial given the Plaintiff's complaints to the School
Board in July 2002.

### B. Mr. Watson's Oppositional Activities Inform the Defendants' Reaction to His Complaints of Discrimination.

An employer does not violate the federal discrimination laws "when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise"; "disruptive or unreasonable protests against discrimination are not protected activity." Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000) (citations omitted).

As a legal matter, these standards are of little consolation to the Defendants because they deny having acted differently toward Mr. Watson after his complaints of discrimination. The court does believe Dr. Rhule harbored animosity toward the Plaintiff and that this may have affected his status as a substitute, at least in her eyes. The Defendants' response, however, is informed by the way Mr. Watson conducted himself.

The factfinder agrees with Drs. Rhule and Connelly that the Plaintiff's handling of the situation was far from ideal. Rather than confront Dr. Rhule directly, Mr. Watson in the first instance aired his "dirty laundry" at a public School Board meeting. Charging a person with unlawful discrimination is a very serious and personal matter, and the factfinder understands why Dr. Rhule reacted (albeit, excessively) as she did.

Although the factfinder tends to believe Dr. Rhule herself did not actively seek to engage the Plaintiff as a substitute, the court is not convinced that the Principal sullied his reputation with Mses. Crook and Campbell. As a matter of credibility, the court does not find it likely that Mr. Watson's interaction(s) with these teachers was as innocuous and benevolent as his testimony suggests. Rather, an undercurrent of confrontationalism permeates the record,

and the court understands why the teachers may have wanted to keep their distance.  *See* discussion *supra* (Plaintiff claimed his communications with these teachers involved matters of protected First Amendment speech); *see also* Pl.'s Ex. 32 (referencing "the teacher(s)" who "alleged [he] was 'harassing' them," not those who Dr. Rhule claimed were being harassed) (emphasis added).

Relatedly, the court finds credible Dr. Connelly's testimony that the Plaintiff got "heated" during their phone conversation, and that the Superintendent had legitimate concerns regarding Mr. Watson's "disrupt[ing] the educational process" and "put[ting] . . . stress on the other staff members."  *See* discussion *supra*; *see also* Tr. 68.97 (Watson, E.) (admitting that, on previous occasion, he stated personal grievances regarding his being reassigned out of daughter's class; "I . . . said I thought it wasn't right, which to me was more than I should have said[ as] a teacher").  The factfinder also concludes that Mr. Watson's reaction to the student teacher incident was overblown, and the court finds both credible and appropriate Dr. Connelly's explanation why the School proceeded as it did.[7]

In sum, the factfinder concludes that Mr. Watson, like Dr. Rhule, was not on "best behavior" in connection with his claims of discrimination.

---

[7]  Dr. Connelly's explanation demonstrates why engaging the Plaintiff, or any other substitute teacher, was not an option.  The permanent teacher left under emergency circumstances, and there was no time to call someone in.

**C.**     **Although the Plaintiff Ultimately Communicated His Desire to Continue Substitute Teaching, the Defendants Received Mixed Messages Regarding the Same.**

The court finds credible Ms. Ryan's testimony that Ms. Watson communicated the Plaintiff did not wish to work at the School. The factfinder does not believe her objections were based solely on the position offered.

This being said, the court concludes that Mr. Watson eventually stated a clear desire to continue substituting, irrespective of his motivations. *Compare* Pl.'s Ex. 31 (suggesting continued desire to substitute) *with* Pl.'s Ex. 32 (Plaintiff had retained counsel and requested hearing). Again, however, the ambivalence in the record informs the Defendants' response.

**D.**     **To the Extent Dr. Rhule Possessed Retaliatory Animus, the Plaintiff Has Failed to Prove Compensable Harm.**

The court finds it more than coincidence that Mr. Watson went from "subbing" an average of 83 times per school year to only twice in 2002-2003. *See* discussion *supra* (95 days in 1999/2000 + 75 days in 2000/2001 + 79 days in 2001/2002 = 249 days, divided by three, = 83 days/year). The extent to which the lack of opportunities were attributable to Dr. Rhule, as opposed to the alienation of Mses. Crook and Campbell, is less clear. *Cf., e.g.*, Tr. at 68.156 (Ryan) (Ms. Rhule never instructed witness to remove Mr. Watson from substitute teacher list, nor was she told not to call him).

Even to the extent Mr. Watson was not called as the result of Dr. Rhule's involvement, the Plaintiff has failed to demonstrate compensable harm.

The only evidence of damages is presented in Plaintiff's Exhibit 16. *See id.* The document says nothing regarding Mr. Watson's loss of "subbing" opportunities,

but rather bases his requests entirely on the failure to be awarded a permanent teaching position. *See id.* The factfinder already has determined that the Plaintiff's non-selection was not the result of discrimination, and his damages theory is untenable.

Attempts to "cobble together" a damages claim are equally unavailing. As suggested above, the court has no idea how many times the Plaintiff would have been called but for Dr. Rhule's presumed intervention. The factfinder remains unconvinced that the Principal dissuaded Mses. Crooks and Campbell from requesting the Plaintiff's services; nor has Mr. Watson shown that the teachers themselves possessed retaliatory animus.

Under the Plaintiff's "best case scenario," the record evidence at best suggests Mr. Watson may have expected to have subbed approximately 83 times during the 2002-2003 school year. *See* discussion *supra* (calculating Plaintiff's previous three-year average).[8] Mr. Watson testified that he was paid somewhere around $65 to $75 per day, *see* Tr. at 68.145, yielding a potential annual income between $5,395 (83 X $65) and $6,225 (83 X $75). Plaintiff's Exhibit 16, however, reveals income from other sources of $6,600 in 2002/2003 and $7,700 in 2003/2004. *See id.*

These setoffs exceed Mr. Watson's potential substitute teaching income from the School, and the factfinder has no evidentiary basis for determining the degree to which the additional income could have been earned had the Plaintiff continued working there.

In the end, any award of damages would be rife with uncertainty and speculation, and the Plaintiff's evidence is fatally deficient. *See* <u>Carroll v. Hoechst Celenese Corp.</u>, 1999 WL

---

[8] Mr. Watson took a job with the Social Security Administration in 2004, *see* Tr. at 68.28 (Watson, C.), and there is no reason to believe he would have continued subbing during the entire 2003-2004 school year.

1330688, *7 (5th Cir. Dec. 17, 1999) ("[t]o recover compensatory damages, [a] former employee

must show more than a violation of [the discrimination laws] by the employer; he or she must

also show individual damages").  Given the Plaintiff's failure to advance the above damages

theory, moreover, the factfinder declines to award nominal damages based on Dr. Rhule's

presumed retaliation.  *See* discussions *supra*; *compare also* Am. Compl. at "Wherefore" clauses

(requesting compensatory and punitive damages) *with* <u>Alexander v. Riga</u>, 208 F.3d 419, 429

(3d Cir. 2000) (entitlement to nominal damages "is not automatic"; "rather, it is incumbent upon

the plaintiff to make a timely request") (citation and internal quotations omitted).[9]

## V.    <u>Conclusion</u>

For all of the reasons stated above, the court finds by a preponderance of the evidence

that Mr. Watson was not the victim of discrimination or compensable retaliation.  Judgment

therefore will be entered in favor of the Defendants and against the Plaintiff.

THESE FINDINGS AND CONCLUSIONS ARE SO ENTERED.


March 25, 2008                                          *Francis X. Caiazza*
                                                        Francis X. Caiazza
                                                        U.S. Magistrate Judge

---

[9]  Under the circumstances, the Plaintiff is not "prevailing party" under the ADEA or PHRA.
*See* <u>Jacobs v. City of Phila.</u>, 2005 WL 1899499, *16 (E.D. Pa. Aug. 8, 2005) ("even [where a
p]laintiff [wins] on liability," "he is not a 'prevailing party'" if factfinder awards zero damages)
(citations omitted), *aff'd*, 2006 WL 3522517 (3d Cir. Dec. 7, 2006).  Had the court entered
nominal damages, an award of attorneys' fees would be no more appropriate.  *Compare*
discussions *supra* (finding deficiencies in Plaintiff's proofs regarding both liability and damages)
*with* <u>Farrar v. Hobby</u>, 506 U.S. 103, 115 (1992) ("[w]hen a plaintiff recovers only nominal
damages because of his failure to prove an essential element of his claim," "the only reasonable
fee is usually no fee at all") (citation omitted).

cc:

Brian Samuel Malkin, Esq.
David A. Young, Esq.
Christina L. Lane, Esq.
John W. Smart, Esq.
Todd P. Prugar, Esq.